# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

SHEILA TITTLE,                                          Case No. 05-12562-RGM
                                                        (Chapter 13)
      Debtor.

## MEMORANDUM OPINION

The issue presented in this case is the effect of Section 502(b)(6), which limits a landlord's rent claim, on a claim for rent reduced to a judgment lien on real property before the filing of the bankruptcy case. The question is raised by the three related matters before the court: confirmation of the debtor's chapter 13 plan, the debtor's objection to the landlord's proof of claim, and the landlord's motion for relief from the automatic stay to sell the debtor's real property that is subject to its judgment liens.  All arise from a lease between Sheila Tittle and J.D. Holsclaw as tenants and The Shops at England Run, Inc., as landlord.  The debtor's chapter 13 plan proposes to pay all allowed claims in full and is funded sufficiently to pay all claims as filed, except the landlord's to which she objects and proposes to pay in accordance with her objection.   The landlord, which is secured by two judgment liens on the debtor's real property, filed a motion for relief from the automatic stay to sell the property secured by its judgment liens.

The debtor and Holsclaw entered into a lease with the landlord dated November 13, 1995, for an initial term of five years with an option to renew.  The option to renew was exercised in a letter signed only by Holsclaw.  The debtor and Holsclaw became delinquent in their rent in 2001. The landlord filed a summons for unlawful detainer in the general district court and obtained judgment for possession and for rent up to the date of judgment.  The judgment was entered on

September 5, 2001, in an amount of about $20,000.00. The following month, the landlord filed suit

in the circuit court against the debtor and Holsclaw for the accelerated rent that was to become due

for the balance of the leasehold, an amount in excess of $200,000.00. This suit was resolved by

entry of a consent judgment order on June 20, 2002, granting judgment against the debtor and

Holsclaw in the amount of $100,000.00. The parties agreed that if the general district court

judgment and $60,000.00 of the circuit court judgment were paid before December 18, 2005, the

judgments would be satisfied in full. The payment was never made. The sheriff executed on the

general district court judgment and recovered about $15,000.00. Both judgments were docketed in

the circuit court clerk's office in the jurisdiction within which the debtor's real property is situate.

The general district court judgment was docketed about October 5, 2001. The circuit court judgment

was docketed about July 24, 2002.

On January 29, 2003, both Tittle and Holsclaw filed voluntary petitions in bankruptcy

pursuant to chapter 7 of the United States Bankruptcy Code.[1] The same individual was appointed

trustee in both cases. He filed a report of no distribution in Holsclaw's case on March 18, 2003, and

in Tittle's case on April 17, 2003. The debtors were granted discharges on May 19, 2003, and their

cases were closed on May 20, 2003.

There was a difference in administration of the two cases. In Tittle's case, on April 11, 2003,

the trustee requested a bar date be set for filing proofs of claims and that an asset notice be mailed

to all creditors. This was done. Six days after his request, the trustee filed his report of no

distribution. On June 25, 2003, more than a month after the case was closed, the trustee requested

that the case be reopened and that the automatic stay be reinstated. The trustee asserted that he had

---

[1]Case Nos. 03-10470-SSM and 03-10469-RGM, respectively.

additional information that suggested that there was equity in certain real property. The motion to reopen was denied by an order entered on the docket on July 18, 2003.

Tittle scheduled two pieces of real estate in her first case. She valued them at $430,000.00 and scheduled secured claims of $117,237.54. She scheduled the landlord with two unsecured claims totaling $234,000.00.[2] Both claims were listed as disputed. The landlord filed a proof of claim which asserted a secured claim in the amount of $120,000.00 secured by real estate with a value of $430,000.00.[3] After Tittle's first bankruptcy case was closed, the landlord filed a bill of complaint in the state circuit court seeking to sell the debtor's two parcels of real property that were subject to its judgment lien.

Tittle filed her present bankruptcy case, a chapter 13 proceeding, on July 7, 2005. She scheduled the same two parcels of real property as in her chapter 7 case, this time with a value of $569,900.00 and subject to liens of about $310,000.00 which includes both of the landlord's judgment liens. She scheduled unsecured priority creditors of $1,801.00 and unsecured non-priority creditors of $250.00. She scheduled typical personal property with the exception of four items: claims for rent from various parties of $4,150.00; a claim against the landlord for unjust enrichment and other claims valued at $350,000.00; a claim for a finder's fee for $40,000.00; and a claim against the attorney who represented her with respect to the landlord for legal malpractice of

---

[2]The second claim, scheduled in the amount of $202,910.00, had previously been compromised for $100,000.00. The debtor disputes the effectiveness of the compromise. She claims the compromise was invalid and that she owes nothing.

[3]There were, in fact, two other significant liens. One was a judgment lien in favor of a hospital for $74,844.12. The hospital, although secured by a judgment lien, filed a proof of claim as an unsecured creditor. The other was a county real estate and personal property tax lien for $23,404.58.

$1,000,000.00.        The November 1, 2005 plan proposes to pay all allowed claims in full by selling her real estate within six months after confirmation of the plan.  The property is subject to real estate taxes; deeds of trust in favor of Wachovia Bank; a judgment lien in favor of Mary Washington Hospital of about $83,856.85; four judgment liens totaling under $12,500.00; and the landlord's judgment liens of $130,000.00.    The debtor objected to the landlord's claim on six bases:

1.    She is not personally obligated to the landlord because her personal liability was discharged in her prior chapter 7 bankruptcy.
2.    The circuit court suit, which was commenced after final judgment was entered in the general district court suit, was barred by the doctrine of res judicata.
3.    The circuit court judgment for rent was obtained by fraud and duress.
4.    The landlord improperly seized possession of contents of the store.
5.    The landlord failed to credit the judgments with rents obtained after the properties were re-rented.
6.    The landlord's claim for rent exceeds the maximum amount permitted by Bankruptcy Code §502(b)(6)(A)and the landlord's docketed judgment is effective only to the maximum amount permitted by §502(b)(6)(A).

The landlord objected to confirmation of this chapter 13 plan and opposes the objection to its claim.  It also filed a motion for relief from stay seeking leave to continue its circuit court suit to enforce its judgments by judicial sale.  The landlord asserts that even if its claim for rent is capped by §502(b)(6)(A), section 502(b)(6)(A) is not an avoidance power and since liens pass through bankruptcy unaffected by a chapter 7 discharge, the balance of its claim remains secured by the debtor's real property.

The debtor is correct that her 2003 chapter 7 discharge relieves her of personal liability for the two judgments.  Bankruptcy Code §524(a)(1).  However, the landlord is also correct that the liens it held before the chapter 7 case and that were not avoided, remain liens against her properties, unaffected by the chapter 7 discharge.  *Farrey v. Sanderfoot,* 500 U.S. 291, 297, 111 S.Ct. 1825,

1829, 114 L.Ed.2d 337, 354 (1991) ("Ordinarily, liens and other secured interests survive bankruptcy"); *Johnson v. Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66, 75 (1991) ("[A] bankruptcy discharge extinguishes only one mode of enforcing a claim – namely, an action against the debtor *in personam* – while leaving intact another – namely, an action against the debtor *in rem*"). These liens may be addressed in a subsequent chapter 13 case. *Johnson v. Home State Bank,* 501 U.S. at 88, 111 S.Ct. at 2156.

The arguments the debtor raises with respect to the validity of the judgments are not matters subject to this court's review. The two judgments were obtained in state courts before the filing of the first bankruptcy and have not been vacated or modified by the state court. As long as the state courts had jurisdiction, this court must give the same preclusive effect to the state court judgments as the state courts would. 28 U.S.C. §1738. *See In re Genesys Data Technologies, Inc.,* 204 F.3d 124, 129 (4th Cir. 2000). Under Virginia law, the debtor cannot now relitigate the issue of whether the second judgment was barred by the doctrine of res judicata; whether the state court properly took into account credits due to the debtor at that time or properly resolved asserted counterclaims or setoff; or whether the option to renew the lease was properly exercised.

It is clear that the state courts had personal jurisdiction over the debtor in both cases. The debtor does not assert that she was not properly before the general district court or the circuit court, and, in fact, asserts that she unsuccessfully defended herself in both suits. The circuit court case was resolved by a consent order. Both the general district court and the circuit court had personal jurisdiction over the debtor because of her personal appearances in the cases and her defense of the cases.

The issue of whether the circuit court judgment was obtained by fraud is a matter that ought to be presented to the circuit court. Although there are circumstances in which a judgment may be collaterally attached, this is not such a case. The debtor settled the circuit court case. The parties agreed to the amount due to the landlord and to a significant discount if she made full payment within a set time. Her assertions about the validity of the consent order principally raise the quality of advise she received from her attorney. While that may constitute malpractice – and she listed a million dollar claim against her attorney on Schedule B – it does not constitute fraud that would avoid the consent judgment.

The debtor's argument about the proper credits to the judgments after the judgments were obtained is not an issue that needs to be resolved in this proceeding. The cap on rent claims under §502(b)(6)(A) determines the maximum allowed claim as of the date of the filing of the petition by comparing the amount due on the date of the filing of the petition and the amount computed under §502(b)(b)(A). No matter how the credits are applied, the credits do not bring amount due on the date of the filing of the petition below the cap. It does not matter whether the credits were or were not properly applied because they do not affect the determination of the maximum amount of the allowed claim in this proceeding.[4]

What is left is the limitation on rent claims imposed by §502(b)(6)(A). The judgments are for rent and §502(b)(6)(A) is applicable. The cap materially reduces the amount of the landlord's allowed claim arising out of the circuit court judgment because the judgment was for rent that

---

[4]To the extent that the debtor is relying on credits that ought to have been taken into account by the state courts in determining the amount of the judgments, the issue is precluded by *res judicata.*

accrued after Tittle and Holsclaw vacated the premises and the landlord repossessed them. Bankruptcy Code §502(b)(6)(A)(ii).

The landlord first attempts to alter the type of its claim. It argues that its claim is a judgment lien, not a claim for rent. The landlord's argument is the same as that raised and rejected in *Cutler v. Lindsey (In re Lindsey),* 199 B.R. 580 (E.D.Va. 1996), *aff'd in part, vacated in part*, 1997 WL 705434 (4th Cir. 1997). Section 502(b)(6) addresses claims. It does not distinguish between secured claims or unsecured claims or claims that have been reduced to judgment or not reduced to judgment. All are claims. *See* Bankruptcy Code §101(5). While a claim can be bifurcated into its secured and unsecured portions under §506, Section 502(b)(6)(A) speaks to the maximum allowed claim without regard to its secured or unsecured status, or whether it was reduced to judgment.

The landlord's more interesting argument is that even if its allowed claim in this bankruptcy case is capped, it retains its *in rem* lien for the balance of the disallowed claim. The court does not agree. If the allowed claim is paid in full, the lien securing the allowed claim is satisfied and must be released. Liens pass through bankruptcy unaffected because the personal obligation to pay the claim is discharged in bankruptcy but the debt itself is not discharged. Here, the claim is neither enforceable against the debtor personally, nor against the debtor's property to the extent the claim as capped by §502(b)(6)(A) is paid in full.

The purpose of §502(b)(6)(A) is to balance the rights of landlords and debtors. A long-term lease can create a very large liability that adversely affects other creditors in the distribution of funds to them and, possibly, the debtor in obtaining a fresh start. Congress recognized not only that at state law a landlord may be entitled to a claim for future rent, but also that it may have possession or be able to recover possession of the real property. Obtaining possession places the landlord in

the practical position of being able to mitigate its losses by re-letting the property. Section 502(b)(6) recognizes these competing factors and balances the rights of landlords and debtors by limiting the landlord's claim. The circumstances in this case reflect Congress' concerns. The landlord recovered its property and had the ability to mitigate its damages by re-letting the property. In balancing the competing interests of all of the parties, Congress did not limit the application of §502(b)(6) only to unsecured claims for rent as opposed to secured claims. It could easily have done so, but did not. It simply established the maximum allowable claim.

The effect of the cap is made clear in chapter 13 by Bankruptcy Code §1327. "The provisions of a confirmed plan bind the debtor and each creditor." Bankruptcy Code §1327(a). "Confirmation of a plan vests all of the property of the estate in the debtor." Bankruptcy Code §1327(b). "Property vesting in the debtor . . . is free and clear of any claim or interest of any creditor provided for by the plan." Bankruptcy Code §1327(c). The chapter 13 plan in this case must provide for the landlord in this case. Unless the landlord accepts the plan or the debtor surrenders the property to the landlord, the chapter 13 plan must provide that the landlord retains its lien securing its claim and that the amount paid to the landlord "under the plan on account of such claim is not less than the allowed amount of such claim." Bankruptcy Code §1325(a)(5). Thus, the debtor's plan must pay the allowed secured claim in full and if the debtor does so, the debtor's property vests free and clear of the lien. The debtor's plan does provide for the landlord in this case by providing for full payment of its lien.

The landlord points to language in the unpublished opinion of the Court of Appeals in *Lindsey* to support its argument. The Court of Appeal, in construing §502(b)(6), reiterates the well-accepted rule of statutory construction that where the statutory language is plain on its face, no

8

further construction is necessary unless the plain reading is "demonstrably at odds with the intent of Congress". The Court of Appeals did not invoke the exception to the plain meaning rule, but the landlord, picking up on the phrase "demonstrably at odds with the intent of Congress" asserts that the purpose of §502(b)(6)(A) is to benefit other unsecured creditors – not the debtor – and to protect other unsecured creditors – not the debtor – from a landlord's large claim, particularly where the landlord has the ability to mitigate its damages. In this particular case, it argues, there are no other significant creditors and Congress' intent in protecting other unsecured creditors – but not the debtor – is frustrated because the benefit of capping its rent claim flows to the debtor herself, not to the other unsecured creditors. The other unsecured creditors will be paid in full in any event. Thus, the debtor's interpretation should not be accepted.

The landlord too easily resorts to the argument that the plain meaning of the statute is "demonstrably at odds with the intentions" of Congress. The Supreme Court held this to be the exception to the rule, and a "rare" one at that. In setting out the exception in *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031 (1989), the Supreme Court stated:

> The plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In such cases, the intention of the drafters, rather than the strict language, controls. *Ibid.*

There is no reason to resort to this exception to the plain meaning rule. First and foremost, the statute itself is unambiguous. It makes no such distinction. Congress could have, if it had been its intention, drafted §502(b)(6) to limit the landlord's claim to the extent necessary to assure payment to other creditors, that is, it could have added another prong to the test that would have

allowed a larger rent claim if all other unsecured creditors were paid in full.  Congress did not do this.

Moreover, the landlord's assumption that Congress' intent was *only* to protect other unsecured creditors is flawed.  The very purpose of the Bankruptcy Code is to provide honest but unfortunate debtors with relief.  That, of course, is not the sole objective.  The Bankruptcy Code also balances the need for debtor relief against the justifiable expectations of creditors and seeks to treat creditors equally.  The same reasons that justify capping rent claims as to other unsecured creditors is equally applicable to debtors seeking a fresh start.  It balances the landlord's justifiable expectations with the debtor's need for a fresh start.  In reaching this balance, Congress recognized the ability of the landlord to mitigate its damages when it regains possession of the real property.  This mitigation – avoiding economic waste – benefits everyone, first creditors, then debtors.

The landlord makes one last argument, that this plan is filed in bad faith.  The landlord asserts that the debtor is endeavoring to accomplish an objective in this chapter 13 case that she could not have accomplished in her prior chapter 7 case.  In particular, the landlord asserts that the debtor could not have implemented the §502(b)(6) cap in her prior chapter 7 proceeding.  The debtor by first having filed her chapter 7 petition and obtaining a discharge and having now filed her chapter 13 petition, is achieving a result that she could not have otherwise obtained, that is, she is retaining the equity in her real property without paying her unsecured creditors who were discharged in her first case.  If the properties had been sold in the chapter 7 case, the landlord asserts, there would have been funds for other unsecured creditors.  Essentially, the landlord is arguing that this is an improper "Chapter 20."

Chapter 20 cases, sequentially filing first a chapter 7 case and then a chapter 13 case, are not

prohibited *per se*.  "Congress did not intend categorically to foreclose the benefit of Chapter 13

reorganization to a debtor who previously has filed for Chapter 7 relief."  *Johnson v. Home State

Bank,* 501 U.S. 78, 87, 111 S.Ct. 2150, 2156, 115 L.Ed.2d 66, 77 (1991).  That, though, does not

permit the filing of every chapter 20 case.  The objective is to distinguish between the permissible

and impermissible sequential filings.  *See In re Taylor,* 261 B.R. 877 (Bankr.E.D.Va. 2001); *In re

Craig*, 222 B.R. 266 (Bankr.E.D.Va., 1998) (Bostetter, C.J.); *In re Cushman,* 217 B.R. 470

(Bankr.E.D.Va., 1998) (Mitchell, J.).  The test for permissible sequential filings is set out in *Deans

v. O'Donnell,* 692 F.2d 968, 972 (4th Cir. 1982) as expanded in *Neufeld v. Freeman (In re Freeman),*

794 F.2d 149, 152 (4th Cir. 1986) and supplemented by four non-exclusive factors first enunciated

in *Cushman.*[5]

In reviewing both the prior chapter 7 case and this chapter 13 case, the court cannot reach

the conclusion that either this case or this chapter 13 plan was filed in bad faith.  The timing of the

two cases is a factor to be considered.  In this instance, the chapter 7 case was filed more than two

years before the chapter 13 case.  This tends to negate the argument that the two filings were planned

to achieve a single objective that could not have been achieved in either one alone.  The court notes

that in each case the debtor was represented by different counsel and in this case, the debtor asserts

a malpractice claim against her first attorney.  During the interim, the landlord had the opportunity

to and sought to enforce its judgments.  The debtor's schedules reflect that she had income from rent

---

[5]*Deans* was not a "chapter 20" case. The debtor had not previously filed bankruptcy. The issue was whether nominal payment plans were *per se* improper under chapter 13. In *Neufeld,* the debtor had previously obtained a chapter 13 discharge and had filed a second chapter 13 case. *Neufeld* is more closely related to "chapter 20" than *Deans*. Nonetheless, all the factors relate to good faith, which is the central factor in the "chapter 20" analysis.

which, presumably, could have been garnished by the landlord.  While it is true that a creditor's suit

takes time, there is no evidence that the debtor waited to the last moment to file the present

bankruptcy and frustrate the landlord's efforts.  The suit was, undoubtedly, a significant precipitating

event.

The court also looks at whether there was a change in circumstances between the first case

and this case.  There is additional debt, but the new debt is relatively modest.  However, the value

of real estate in this district has, in general, increased significantly in the last several years.  This

general appreciation created additional equity in the debtor's real property, something that could not

have been fully anticipated in 2003 when the first case was filed.  It is this new equity that the debtor

now seeks to protect.[6]

The property was fully and fairly disclosed in the schedules in both cases.  The schedules

in both cases show, on their face, that there is equity in the real property.   It is not known why the

chapter 7 trustee followed the course that he did.  He first asked for an asset notice and then filed

a no asset report a week later.  After the case was closed, he sought to reopen the case to administer

the real property.  It is unclear whether there was sufficient equity without application of §502(b)(6)

in the two properties at the time the trustee filed his no-asset report in the first case to justify

administration for the benefit of unsecured creditors after taking into account the costs of sale and

the costs of administration.  It is possible that the trustee belatedly saw the benefit of applying the

§502(b)(6) cap to the landlord's claim in the prior case.  If the trustee had pursued this approach

earlier, he might have limited the effect of the landlord's lien, sold the properties, paid the landlord

---

[6]The debtor kept the mortgages on her properties current for most of the period between the two
bankruptcy cases.  There was a small arrearage at the time of this filing.

the amount of its capped lien, and distributed funds to the general unsecured creditors.  The trustee did not do this.  The record is silent as to his reasons for his action.  The significance in the chapter 20 analysis is that the decision to sell the properties was the trustee's, not the debtor's.  The trustee had sufficient information to cause him to investigate the matter.  Had the trustee acted, the landlord would have been no better off than he is today with respect to the amount of its allowed claim.  The case was properly not reopened because at the time the case was closed, the property ceased to be property of the estate and revested in the debtor.  Bankruptcy Code §554(c).  Reopening the estate does not revest abandoned property back into the reopened estate.  There is no indication that the debtor made any misrepresentation to the trustee.  Indeed, had she done so, her discharge could have been revoked.  Bankruptcy Code §727(a)(2), (3) and (4).

The court finds that the two filings were not made in bad faith and are permissible.  There is no evidence that they were pre-planned to achieve a result that could not have been achieved otherwise.  This chapter 13 case probably would not have been filed if the value of the real estate had not increased significantly during the past three years.  The creditors' suit would have inevitably resulted in the sale of the properties.  The intervening appreciation appears to be the change in circumstances causing the debtor to file this second case.  In doing so, the debtor assures that her secured and unsecured creditors will be paid in full even though the landlord's claim will be capped.  This same result as to the other unsecured and secured creditors is not as likely in a state court creditors' suit because the property ultimately is sold at public auction.  Frequently, small, junior creditors are unable to economically protect their rights.  Unsecured creditors are not paid at all.  It is true that the debtor also benefits from this filing, but that is not the controlling factor.

13

The cap imposed by §502(b)(6)(A) is properly imposed on the landlord's claim.  However, the plan cannot be confirmed as presently proposed because creditors must be paid at least as much in the chapter 13 case as they would be in a chapter 7 case.  The debtor asserts that she has assets worth well over $1,000,000.00, predominantly based on the valuation of a malpractice claim against her former attorney.[7]  The court must, at this time, accept the debtor's valuation of the malpractice claim.  It appears that the debtor is a solvent debtor, in which case, interest must be paid on all creditors' claims.  Interest must be paid to the landlord on its allowed claim if it is oversecured without regard to the overall solvency of the debtor.  This appears to be the case.  Unless there are other circumstances indicating that the debtor is not solvent and that the secured creditors are not oversecured, the proposed chapter 13 plan must be modified to provide for the payment of interest.  Post-petition interest must be paid to the landlord on its secured claims at the rate recovered under its judgment to the extent permitted by §506(b) and to the unsecured creditors at the federal judgment rate.

Alexandria, Virginia
March 20, 2006

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Robert Easterling
Gerald M. O'Donnell
Kevin M. O'Donnell

12796

---

[7]The court is somewhat skeptical as to this value.

14